Filed 10/14/15  In re Jose G. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re JOSE G., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>JOSE G.,<br><br>       Defendant and Appellant. | A142700 & A143608<br><br>(Contra Costa County<br>Super. Ct. No. J1000539) |

Jose G. appeals from two separate dispositional orders recommitting him to the Youthful Offender Treatment Program ("YOTP") located at juvenile hall.  In both cases, the minor makes similar arguments that the juvenile court abused its discretion by: implicitly concluding that the public's interest in incarcerating Jose outweighed the minor's interest in rehabilitation; ordering Jose to restart the entire YOTP, rather than just the final phase; committing Jose to a program that failed to serve the underlying purposes of the Juvenile Court Law; failing to impose less restrictive suitable alternatives to the YOTP; and failing to provide Jose with individualized consideration.  On March 25, 2015, we granted Jose's motion to consolidate both cases for decision.  Seeing no abuse of discretion in either matter, we affirm.

1

## I. FACTUAL BACKGROUND

### A.     *Jose G.'s Background and Upbringing*

Jose—age 18 by the time the second commitment order here at issue was entered— is the child of a five-year relationship between his mother and father, who are not married.  They have never lived as an intact family, and Jose rarely sees his father.  In October of 2009, Jose's mother called Child Protective Services because she did not know what to do with her son, but the allegation was deemed unfounded, the family was advised to seek therapy, and the case was closed.  Jose was later hospitalized twice under section 5150 of the Welfare and Institutions Code for threatening to harm himself.  He has been diagnosed with Attention Deficit Hyperactive Disorder (ADHD) and Oppositional Defiant Disorder (ODD).  He is also a habitual marijuana user.  In 2010, Jose admitted to associating with older gang members of the "10th Street MOB" for the past four years.  He initially became involved with these gang members because his older brother associated with them.   By the time the juvenile court entered the dispositional orders at issue in these appeals, Jose had been arrested on three occasions, violated probation conditions numerous times, and had been placed at six different rehabilitation programs, all of which had proved ineffective.

### B.     *Jose G.'s Delinquency History*

#### 1.     *First Juvenile Wardship Petition*

On April 13, 2010, the Contra Costa County District Attorney's Office (DA) filed an original juvenile wardship petition under section 602 of the Welfare and Institutions Code, alleging that Jose threatened a public officer, a misdemeanor violation of Penal Code section 71.[1]  Specifically, the minor and his two co-responsibles threatened an off-duty police officer who was with his children at a mall.  The officer in question knew all three co-responsibles, including Jose, to be involved in a criminal street gang.  On May 13, 2010, the DA filed an amended wardship petition, additionally alleging that Jose

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

had made a criminal threat, a misdemeanor violation of section 422, based on the same conduct.

On June 30, 2010, Jose pled no contest to the allegations in the petition. Thereafter, the juvenile court sustained the section 422 violation and dismissed the section 71 allegation. The court ordered Jose to be released to his mother on home supervision until the dispositional hearing. At the dispositional hearing on July 15, 2010, the juvenile court adjudged the minor a ward of the court. Jose was placed on juvenile electronic monitoring, ordered to reside at home with his mother, and directed to comply with standard conditions of probation.

On August 19, 2010, Jose admitted and the juvenile court sustained a probation violation for testing positive for marijuana. Thus, on September 2, 2010, the juvenile court committed the minor to the Orin Allen Youth Rehabilitation Facility ("OAYRF") in Byron, California, for six months. While at OAYRF, Jose reportedly had difficulty following staff directions and program rules. He displayed "very poor" behavior in school. Nevertheless, he was released on February 28, 2011, when his commitment expired, and placed on a 90-day period of parole.

### 2. *Second Juvenile Wardship Petition*

On March 8, 2011, the DA filed a supplemental wardship petition under Welfare and Institutions Code section 602, charging Jose with felony possession of a firearm by a minor (formerly § 12101, subd. (a); see §§ 29610-29750) and felony receipt of stolen property (§ 496, subd. (a)). The charges stemmed from an incident which occurred only six days after Jose was released into the community. At that time, he was observed ducking behind a car when a police officer recognized him on the street. The officer subsequently discovered an unloaded firearm behind the vehicle. Jose later admitted to taking the gun from an acquaintance.

Thereafter, on March 9, 2011, the DA filed a notification of a probation violation, alleging that the minor had violated his curfew on March 4, 2011. In addition, Jose's mother reported that the minor's behavior had been poor since he was placed on probation. Specifically, the minor refused to attend therapy or summer school, left home

3

without permission, was defiant, smoked marijuana, and allowed unauthorized visitors into the family home. The juvenile court sustained both felony charges as well as the probation violation on April 1, 2011. At the dispositional hearing on April 15, 2011, the juvenile court again committed Jose to OAYRF, this time for a nine-month mandatory program, and ordered the minor to obey standard conditions of probation.

In July 2011, Jose was removed from OAYRF for several days after developing a rash through contact with poison ivy. Within hours of his return to the facility on July 22, 2011, however, the minor refused to participate any further in the program. On August 18, 2011, the juvenile court sustained the minor's probation violation for refusing his program at OAYRF. Jose requested to be placed somewhere else, and the juvenile court ordered the minor to be placed at Courage to Change in Exeter, California. He was transported to this program on September 29, 2011. While in juvenile hall pending placement, however, Jose received infractions for not following directions, contraband, staff manipulation, and being disrespectful toward staff. He was placed in a special program after having conflict with another minor.

On October 16, 2011, the minor violated his probation again by absconding from Courage to Change less than a month after his placement there. He was terminated from the program the following day. On October 21, 2011, the juvenile court sustained the minor's probation violation for absconding from Courage to Change. The juvenile court then placed Jose at Boy's Republic in Chino Hills, California on November 4, 2011.

While at Boy's Republic, Jose was reported to excel in school, with exceptional behavior in the classroom and good grades. Generally, however, he was defiant towards staff, disrespectful, and challenged other residents to fights. He also struggled with anger management and tended to have derogatory outbursts when he did not get his way. On April 14, 2012, the minor violated his probation once more by absconding from Boy's Republic. His whereabouts were unknown for almost four months, until he surrendered himself at juvenile hall on August 7, 2012. On August 14, 2012, the juvenile court sustained Jose's probation violation for absconding from Boy's Republic. The minor was next placed at Bar-O-Boys Ranch in Crescent City, California, on September 6, 2012.

4

On September 10, 2012, Jose violated probation by failing to obey the rules at Bar-O-Boys Ranch, and thus his placement there was terminated. According to his discharge summary, Jose had trouble adjusting to the program from the start and was observed verbally attacking staff and peers. He was terminated from the program because his behavior was creating a distraction for other residents. On September 18, 2012, the juvenile court sustained the minor's probation violation. It placed Jose at New Journey in Visalia, California on October 8, 2012.

While at New Journey, the minor made "minimal progress" in his placement goals. Rather, he received thirteen negative incident reports in the months of December and January alone, which included using profanity, making derogatory comments towards staff, using marijuana, bullying vulnerable residents, being in possession of pills, absconding, being in possession of urine, and refusing program services. On January 31, 2013, the minor violated probation by acting aggressively toward the staff at New Journey and refusing to follow their directions. On February 21, 2013, the juvenile court sustained Jose's probation violation. On March 8, 2013, the juvenile court ordered the minor to participate in the YOTP located at juvenile hall. Specifically, Jose was ordered to "successfully complete all phases, follow all treatment requirements and obey all rules and regulations."

### 3. *Placement at YOTP*

On March 9, 2013, Jose entered the YOTP and, over the course of one year, successfully completed the Aggression Replacement training, including the Anger Control, Moral Reasoning, and Pro-Social Skills courses. The minor also completed the Thinking for a Change, Victim Empathy, and Job Tech courses. Moreover, he completed all of his high school graduation requirements and YOTP staff reported that Jose had exhibited positive behavior and conducted himself at an appropriate level since the beginning of December 2013. Accordingly, on February 19, 2014, the juvenile court ordered the minor to be released to complete Phase IV of the YOTP while residing in the home of his mother.

Jose stated that while he was at home he never used drugs, passed his drug tests, applied to Diablo Valley College, wanted to transfer to Butte College, and found employment at a thrift store in Martinez, California. However, on May 2, 2014—shortly before he was scheduled to complete Phase IV—Jose violated his probation by leaving his home without permission, cutting off his GPS transmitter, and absconding. Jose's whereabouts remained unknown until the Concord Police Department arrested him on May 19, 2014, for an alleged felony violation of sections 211 and 212.5, subdivision (c) (second degree robbery).[2] On May 22, 2014, Jose admitted and the juvenile court sustained the minor's probation violation. According to Jose, he cut off his GPS transmitter because he witnessed one of his friends have a seizure and "got scared and very paranoid" because it "brought back memories and nightmares of when I witnessed a murder while I was in a group home . . . ."

On June 16, 2014, at the dispositional hearing, Jose's probation officer, William Jones, recommended that the minor re-enter the YOTP and redo the same classes that he had already completed, even though there was no new content in the program. Specifically, Mr. Jones argued that "the in custody component of YOTP may be the minor's final opportunity to redirect his delinquent behavior as a juvenile. Less restrictive attempts at rehabilitation were completely unsuccessful and YOTP is the best option for services at this time." Upon re-entering the YOTP, Jose would have the option of repeating classes and could also work providing janitorial services to the program. Bruce Pelle, the probation director of the Contra Costa County probation department, testified that several minors had participated in the in-custody portion of the YOTP on more than one occasion or had returned and gone through one of the phases of the program. Mr. Pelle, however, also testified regarding the lack of educational options for high school graduates in the YOTP.

---

[2] These new charges were not filed or proved at the time of the dispositional hearings at issue, reportedly because the victim, who was a transient, could not be found. At the June 2014 dispositional hearing, the court expressly stated it was not considering the recent charges in making its determination.

Defense counsel argued that the minor should be released to his mother to restart the out-of-custody Phase IV portion of the YOTP because it would allow Jose to start college and find a job in order to reintegrate himself into the community, rather than locking him up and isolating him in a program devoid of rehabilitative opportunities. The DA, in contrast, pointed out that every time Jose was released, he re-offended in a short period of time and stated: "YOTP, whether it rehabilitates him or not, will protect the community for a good period of time, and that's worth something." In the end, the juvenile court continued Jose as a ward of the court and ordered the minor back to the YOTP to "complete all treatments and phases of the program."

In particular, the juvenile court reasoned that the only conclusion that could be drawn from the minor's history was that "nothing we have tried has changed his commitment to—disrespects staff, not get along, bully other people, all the things that they try and teach him at the hall, at the Ranch and placement, at YOTP, they just haven't affected him at all." Moreover, the court was convinced that the minor would not stay if released back to his mother. Thus, while acknowledging the limited educational opportunities available to Jose in the YOTP, the juvenile court determined that there was a benefit to the public in that the minor would be confined. In addition, the court said that it hoped Jose would "benefit from whatever classes he can take that he's interested in and try to, quote, excel as he has in the past." In sum, the juvenile court saw the YOTP "as simply the only—only possible chance we have to once more try and instill in him what he needs to get along when he is an adult and out in the outside world." On August 7, 2014, Jose filed a timely notice of appeal challenging the juvenile court's dispositional order re-committing him to the YOTP.

### 4. Second Placement at YOTP

On July 13, 2014, while the minor was in juvenile hall awaiting placement back in the YOTP, he tested positive for benzodiazepine. Jose, however, denied taking any pills or medicine that was not prescribed to him. Moreover, a registered nurse at juvenile hall examined Jose at the request of his probation counselors and found nothing abnormal. According to Jose, because of this incident, he was denied the opportunity to take a

7

shower that evening.  Later that night, Jose exited his room and twice refused orders to go back in.  According to Jose, he did not return to his room because he wanted to talk to the supervisor about taking a shower.  Although the minor subsequently complied and returned to his room, he banged on the door and yelled for approximately one hour thereafter.

On July 18, 2014, the DA filed a notification of probation violation against Jose for failing to obey rules of the county institution by refusing to enter his room, thereby causing a building emergency, as well as for testing positive for benzodiazepine.  On October 1, 2014, the juvenile court sustained the allegation that the minor violated his probation by refusing to enter his room.  The court, however, found the allegation that he used benzodiazepine not proven.

In his dispositional report, Deputy Probation Officer Jones stated that Jose had engaged in numerous instances of disruptive and defiant behavior in juvenile hall since the July 2014 probation violation.  The most serious incident involved Jose attempting to assault a peer in the gym and resulted in the minor being placed on maximum security status.  The minor also had instances where he disrupted the unit by banging on his door and yelling profanities.  On September 7, 2014, Jose refused to enter the YOTP as directed by the juvenile court.  It was decided that his place on the waiting list would be maintained pending the outcome of his latest probation violation.  Mr. Jones continued to recommend that Jose be re-committed to the YOTP.  On October 22, 2014, the minor was ordered detained in county jail per his request pending disposition.  He had stated on October 7, 2014, that he would more than likely continue to refuse to re-enter the YOTP program.

At the November 19, 2014 dispositional hearing, Mr. Jones stated that, should Jose restart the YOTP program, he would be taking the same classes he completed earlier as well as a new class called "Moving Forward," which was designed to allow juveniles to implement their previous coursework.  Although Mr. Jones considered the minor's completed coursework in making his recommendation, he believed that the YOTP program would help Jose this time because he likely did not understand or apply the

8

skills he learned the first time around, but this time would "be able to straighten himself out" if he took the program seriously. As Mr. Jones described it: "It's almost like being prescribed medicine for an illness. You might take a certain dosage, and it wouldn't work, and you get another dosage of it and it might take." He also explained that there were no other out-of-home placement options available to the minor because he already had his diploma, had failed at previous placements, and was a flight risk. Moreover, the minor's mother told Mr. Jones that she wanted Jose to undergo some kind of treatment.

Mr. Pelle then testified that a computer education program was currently in development at the juvenile hall and would likely be implemented within the next month or so. Finally, Jose also made a statement to the court, saying: "I feel like I'm unfit for the YOTP program. I have completed successfully all of the treatment classes. I am committed to doing them over again. There is nothing different about the classes that I have already taken. . . . [¶] . . . I want . . . to be able to further benefit myself in my education. I want to become [] something positive."

At the conclusion of the hearing, the juvenile court re-committed Jose to the YOTP to complete all treatment and phases of the program, explaining: "I understand his position. I can see why he wouldn't want to do it over, but yet, Mr. Jones is someone who knows your client, and he says he just didn't get it. He thinks that he can get [it] if he goes through it again, and when he said that to the court and he said that in his testimony, I thought he's probably right, you know, that this is the best thing to give him a last chance. He's someone who knows your client. He's been with him. He knows the family. He's talked to them. The mother wants treatment. This is treatment. He's had some of it before. I would prefer that the computer aspect of the YOTP program was up and running and going strong. That's always something good to learn. But these—these other issues he has really don't look like they've been addressed. He really hasn't changed, given what's happened. [¶] So the court does find that the best place for him is YOTP and that he has one year—at least one year, three months, and one day of confinement time remaining as of today, and that he be continued as a ward of the court

pursuant to 602." On November 20, 2014, the minor filed a timely notice of appeal challenging the November 19, 2014, dispositional order.[3]

## II. DISCUSSION

### A. *Standard of Review and Applicable Law*

Delinquent minors that are under the jurisdiction of the juvenile court must "in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter." (Welf. & Inst. Code, § 202, subd. (b).) For purposes of this statute, "punishment" means sanctions, and permissible sanctions include, among other things, "[c]ommitment of the minor to a local detention or treatment facility, such as a juvenile hall, camp, or ranch." (*Id.*, § 202, subd. (e).) When a juvenile court is "determining the judgment and order to be made in any case in which the minor is found to be a person described in Section 602, the court shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (*Id.*, § 725.5.) Additionally, in all of its deliberations under the Juvenile Court Law, a juvenile court must "consider the safety and protection of the public, the importance of redressing injuries to victims, and the best interests of the minor." (*Id.*, § 202, subd. (d).) In sum, the primary goal of the Juvenile Court Law is "to rehabilitate juvenile offenders while both protecting the public and holding the person accountable for his misconduct." (*John L. v. Superior Court* (2004) 33 Cal.4th 158, 182-183 (*John L.*).)

Within this statutory framework, "[t]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a

---

[3] Although the notice of appeal also indicates that the minor is appealing from the juvenile court's October 1, 2014, probation violation finding, Jose has not raised any challenges with respect to the underlying violation in his briefing before this court and thus any such claims are deemed abandoned.

10

dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.) Thus, we review a juvenile court's commitment decision or dispositional order under the abuse of discretion standard. (*In re Antoine D.* (2006) 137 Cal.App.4th 1314, 1320; *In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329-1330; *In re Todd W.* (1979) 96 Cal.App.3d 408, 416.) When we review these orders, "[w]e must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them." (*In re Lorenza M.* (1989) 212 Cal.App.3d 49, 53.) Substantial evidence is defined as evidence that is "reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jorge G.* (2004) 117 Cal.App.4th 931, 942.) In the end, "[i]t is not the responsibility of this court to determine what we believe would be the most appropriate placement for a minor. This is the duty of the trial court, whose determination we reverse only if it has acted beyond the scope of reason." (*In re Khamphouy S.*, (1993) 12 Cal.App.4th 1130, 1135.)

**B.      The June 2014 Dispositional Order (A142700)**

With these standards in mind, we have little difficulty concluding that the juvenile court did not abuse its discretion when it ordered Jose to complete all treatment and phases of the YOTP program in its June 16, 2014, dispositional order. The minor had shown few signs of improvement or rehabilitation throughout his lengthy placement history. In contrast, when the juvenile court placed him in the YOTP for the first time in May 2013, Jose finally made strides toward achieving his academic and rehabilitative goals, such as completing his high school diploma and reducing his disruptive and defiant behaviors. Although the educational benefits to repeating the YOTP may have been limited for Jose, its treatment components in areas such as anger management, moral reasoning, socialization, and drug abuse remained highly relevant to the minor's ultimate ability to reintegrate back into society as a functioning adult. (See Welf. & Inst. Code, § 202, subd. (b) [guidance given to a juvenile court ward "should enable him or her to be a law-abiding and productive member of his or her family and the community"].) Indeed, the juvenile court could quite reasonably have concluded on this record that, without the

11

ability to moderate his behavioral issues with respect to criminality, substance abuse, aggression, and defiance of authority, the minor's prognosis remained poor despite his educational achievements. Thus, substantial evidence supports the juvenile court's decision to recommit Jose to the YOTP because it had shown itself to be by far the most effective program available to rehabilitate the minor.

In reaching this conclusion, we necessarily reject the minor's related argument that the juvenile court abused its discretion by "arbitrarily" ordering him to restart the YOTP from Phase I, because there was no evidence that re-starting the program from the beginning would provide any additional benefit to the minor. To the contrary, as stated above, the treatment components of the YOTP had the potential for providing significant benefits to Jose, despite the fact that he had already been exposed to much of their content. Indeed, the juvenile court concluded that Jose's first attempt at the program had done nothing to actually change his dysfunctional behaviors and indicated its hope that a re-commitment to the YOTP would provide an opportunity for the minor to benefit from the classes available to him. Further supporting the juvenile court's approach, Mr. Pelle testified that other minors had repeated the in-custody portion of the YOTP or had come back to re-take certain phases of the program in the past. As the juvenile court noted, Jose "[a]lmost made it at YOTP last time." It was not unreasonable on these facts for the court to conclude that re-starting the YOTP was the "only possible chance we have to once more try and instill in him what he needs to get along when he is an adult and out in the outside world."

Finally, there is nothing in the record supporting Jose's contention that the juvenile court improperly found that the public interest in the minor's confinement outweighed his interest in rehabilitation. The juvenile court certainly stated that there was a benefit to the public that the minor would be confined, but it was incumbent upon the juvenile court to "consider the safety and protection of the public" in crafting its dispositional order. (Welf. & Inst. Code, § 202, subd. (d).) Moreover, notwithstanding Jose's assertions to the contrary, his criminal history, prior gang affiliation, and extensive record of disruption and defiance both at home and in placement clearly indicate that

12

placing the minor back in the YOTP for the sake of public safety was justified. As stated above, however, the juvenile court was also concerned with Jose's best chance at rehabilitation, given that the minor's own persistent misconduct had severely limited the dispositional options available to him. Under such circumstances, we do not find that the juvenile court's June 2014 dispositional order was improperly skewed in favor of public safety. We deem it instead consistent with the primary goal of the Juvenile Court Law— "to rehabilitate juvenile offenders while both protecting the public and holding the person accountable for his misconduct." (*John L.*, *supra*, 33 Cal.4th at pp. 182-183.)

## C.    The November 2014 Dispositional Order (A143608)

With respect to the juvenile court's second dispositional order re-committing Jose to the YOTP, the minor again argues that the juvenile court improperly concluded that incarcerating him for the safety of the public outweighed his rehabilitative needs. As stated above, the record in these matters amply supports the conclusion that Jose represented a public safety risk. However, the record further reflects that the juvenile court predominantly, if not solely, focused on Jose's rehabilitative needs in crafting its November 2014 dispositional order. Specifically, the juvenile court relied on Mr. Jones' opinion that minor "just didn't get it" the first time through the YOTP and that he could "get it" if he went through the program a second time. The court went on to conclude that the best place for *the minor* was the YOTP, viewing it as the "best thing to give him a last chance." Thus, the court was not improperly focused on public safety in making its dispositional determination.

With respect to Jose's renewed argument that the juvenile court committed an abuse of discretion when it ordered him to restart the YOTP program from the beginning, the evidence at the second dispositional hearing was even stronger that repeating the YOTP had the potential for providing significant benefits to Jose. Mr. Jones testified that the program now included a new class called "Moving Forward," which was designed to allow juveniles to implement their previous coursework. In addition, the program had been restructured to be performance-based, so that Jose would actually have to show an understanding of how to use and model the skills taught before moving on to the next

13

phase. Previously, Jose had been automatically "phased up" after each 18-week period. Finally, Mr. Pelle testified that a computer education program was currently in development at the juvenile hall and would likely be implemented within the next month or so. Thus, the program contained significant new content, as well as the existing therapeutic components that could benefit the minor.

As Mr. Jones described it: "It's almost like being prescribed medicine for an illness. You might take a certain dosage, and it wouldn't work, and you get another dosage of it and it might take." Jose, of course, argues that he is getting the exact same dosage that he previously received and that was ultimately unsuccessful. As explained above, this argument is factually incorrect. More importantly, however, it ignores the fact that the minor is now a different person than he was during his previous stint in the YOTP and may be able to better internalize the tools presented to him. Perhaps a more apt analogy would be to an addict returning to a twelve-step program such as Alcoholics' Anonymous after a relapse. Regardless, we see no abuse of discretion in the juvenile court's decision to provide Jose with a second dose of the YOTP.

Jose next asserts that the juvenile court abused its discretion by not imposing a less restrictive alternative than commitment to the YOTP. In making this argument, the minor relies on authority that a juvenile commitment requires "evidence in the record demonstrating probable benefit to the minor, and evidence supporting a determination that less restrictive alternatives are ineffective or inappropriate." (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576.) Jose advances two suitable alternatives: in-home supervision and county jail. Based on this record, however, the juvenile court could reasonably find that placing the minor back on home supervision with his mother would be ineffective. Jose had absconded from multiple therapeutic placements in the past and, most recently, had removed his GPS unit and absconded from his mother's home. Indeed, the minor was unable to follow the rules each of the three times he was placed with his mother during the pendency of these proceedings. In addition, the minor's probation officer testified that home supervision was inappropriate for Jose, not only because he was a flight risk, but also because he was in need of treatment because he hadn't yet dealt with

14

his problems.  Even Jose's mother believed that he needed some kind of treatment.  As the juvenile court judge who made the first commitment order to the YOTP in June 2014 put it:  "So am I about to turn him loose on home supervision? . . . It just can't happen.  He won't last.  He won't stay.  [¶] . . . [¶]  I just cannot say goodbye to him and open the door and send him out to try and live alone or [] with Mother.  I know because it's failure from the start."

Furthermore, the minor's contention that county jail is a less restrictive and more suitable alternative in this situation lacks merit.  First, the county jail contains older and more sophisticated criminal offenders than those housed in juvenile hall.  Given that this minor was negatively influenced by his association with older gang members at an early age, placement with adult criminal offenders in a jail setting could reasonably be viewed as inadvisable.  Second, although certain educational opportunities existed in the county jail, it did not provide the therapeutic environment focused on rehabilitating people within the minor's age group that was available through the YOTP.  As such, the juvenile court did not abuse its discretion in choosing the YOTP over jail.

Jose's final contention, that the juvenile court did not provide "individualized consideration of the offense, the offender, and the public interest" in accordance with *People v. Superior Court (Alvarez)* 14 Cal.4th 968, 978, when placing him in the YOTP is easily rejected.  Indeed, the premise behind this argument seems to be that the minor did not receive the individualized consideration that was his due because the juvenile court refused to place him with his mother so that he could continue his studies.  As discussed above, however, significant evidence in the record supported the conclusion that placement of Jose at home in an unstructured setting was unlikely to be successful in rehabilitating the minor.  Moreover, the testimony and evidence in front of the juvenile court regarding Jose's particular situation and history was abundant and easily supports the juvenile court's dispositional order.  While we applaud the minor for seeking to improve his current situation and certainly hope he achieves future academic success, the juvenile court's decision to commit Jose to the YOTP was not improper simply because it was not the minor's hoped for outcome.  There was no error.

15

# III. DISPOSITION

The judgment is affirmed.

_____
                                                                         REARDON, ACTING P. J.


We concur:


_____
RIVERA, J.


_____
STREETER, J.

*People v. Jose G.*  A142700, A143608

18